OPINIONS OF THE SUPREME COURT OF OHIO

**** SUBJECT TO FURTHER EDITING ****

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Johnson, Appellant.
[Cite as State v. Johnson (1994),    Ohio St.3d    .]
Criminal law -- Aggravated murder -- Defendant deprived of his
    constitutional due process right to a fair trial during
    guilt phase of capital trial, when.
    (No. 92-2628 -- Submitted November 29, 1994 -- Decided December 23, 1994.)
Appeal from the Court of Appeals for Summit County, No. 15065.

Defendant-appellant, Michael Jeffrey Johnson, was a brother of the murder victim, Susan Brunst, who disappeared from her Akron apartment during the early morning hours of June 2, 1990.

On June 1, 1990, Brunst had an argument with her boyfriend, Ronald Cook, at her apartment. Cook testified that at approximately 3:00 p.m., Brunst was still upset and told him that she was going to visit her friend Linda Starcher and get drunk. Brunst arrived at Starcher's house with a bottle of vodka.

Starcher testified that Brunst drank until 8:00 or 8:30 p.m. and also smoked marijuana. About 9:00 or 9:15 p.m. Brunst left Starcher's house and went to the East Akron Eagles Club, where she had two more drinks. She then left around 11:00 p.m.

At approximately 11:15 p.m., defendant entered the Eagles Club with a friend, James Westberg. Maida Cain, a barmaid at the Eagles Club told Johnson that Brunst had been there alone and that she had just left drunk. Cain testified that Johnson tried to call Brunst from a pay phone, but that there was no answer. Johnson told Cain that he was sure that Brunst had arrived home and that he would check on her in the morning.

Meanwhile, Cook was in Suffield, Ohio, babysitting his children. He testified that he tried to call Brunst several times during the night of June 1, but that she did not answer until midnight. After a brief argument, Cook hung up but

immediately called again.  During this second call, Cook asked her, "Who is there now?"  Brunst replied, "Nobody" and then told Cook, "I'm sick, I'm going to be sick, I got to go, I love you, bye."

Cook further testified that he called again "almost immediately," but got no answer.  He gave up trying to call back, and figured that Brunst was either throwing up or asleep.  At about 12:15 a.m. Cook went to bed.

At approximately 1:00 a.m., Johnson and Westberg left the Eagles Club.  Johnson told Westberg that he wanted to stop and check on his sister, so the two drove to Brunst's apartment, which was about ten minutes away.  At that time, Johnson went in with a can of Budweiser while Westberg stayed outside.  Approximately ten minutes later, Johnson returned from inside without the beer can and the two drove to the apartment complex where they both lived.

Westberg testified that Johnson told him that Brunst was lying on her "bad naked" with the door wide open, and that Johnson "went on about that for about five minutes," calling Brunst a "stupid bitch and things like that."

At around 4:30 a.m., Johnson's next-door neighbor, Maureen Roop, was driving home from an early breakfast.  As she drove toward her apartment, she passed Johnson, who was driving in the opposite direction, away from the apartment complex.  Edward Collver, a former coworker and employer of Johnson, testified that on Saturday, June 2, Johnson failed to show up for work as expected at 7:30 a.m.  Collver stated that before that day, Johnson had never missed work.

Meanwhile, at 9:00 a.m. Ron Cook went to Brunst's apartment and found the door open.  He noticed an address book and a small jewelry box on the ground outside the door.  Cook went through the apartment twice looking for Brunst, but could not find her.  Cook found Brunst's purse and keys on the living room table.  While some of the clothing Brunst had worn the previous day was in the bedroom, Cook was able to find only one of the matching pink socks.  Cook also found a Budweiser beer can in Brunst's bedroom.

After calling Linda Starcher, Cook called the police and reported Brunst missing.  He then called several more of her friends to ask if they had seen Brunst.  Starcher went over to Brunst's apartment, where she noticed clothes Brunst had been wearing.

Later that afternoon, Cook went to Johnson's apartment, and asked him, "Do you have Susan in there?"  Johnson replied: "[L]eave me out of this.  ***  You and her had an argument and she just took off *** and I don't have her ***."

That evening, Akron Police Detective Daniel Zampelli went to Brunst's apartment, where he found Cook.  The apartment had not been preserved as a crime scene.  Zampelli noted that the ringer on Brunst's phone had been turned off.  He saw no signs of a struggle in the apartment.  The beer can had been moved and Cook had begun cleaning up Brunst's vomit from the bathroom floor.  Cook gave the detective a list of people who knew Brunst and whom Brunst had been with the night before.  Cook also gave Zampelli the beer can and described to him what was "normal" and "out of the ordinary" in the apartment.

In the succeeding days, detectives interviewed Johnson

several times.  On June 3, Johnson admitted to Detective Charles Snyder, Jr. of the Akron Police Department that he had left his beer can at Brunst's apartment.  Johnson told Det. Snyder that his sister was drunk at the time and he complained at length about Ron Cook, telling Snyder that Brunst had been "broken-hearted" because she knew Cook had been "running around."

On June 5, Det. Snyder talked to Johnson again.  Although Brunst had not been found, Snyder noticed that Johnson was already referring to her in the past tense.  Johnson told Det. Snyder that he wasn't guilty of her murder, but he "might as well confess and get it all over with" because "his family was trying to slander him."  During this interview, Johnson also told Snyder he was mad at Brunst because he had overheard her telling Loretta Hopkins "about his prison experience" and "how kinky he was."  On June 8, Snyder again interviewed Johnson and noted that Johnson maintained eye contact until asked about Brunst.  On June 11, Johnson told Zampelli:  "If you think I killed them, go check in the Gorge [a park near Johnson's home] where I threw her body, like I threw all the other women's bodies."

Family members testified that Johnson behaved suspiciously during June 1990.  He refused to help his family search for Brunst, and told another sister, June Jones:  "I'm not looking for the bitch."  He tried to sell his truck and made plans to vacate his apartment.  Brunst's daughter Cynthia testified that she saw an overnight bag belonging to Brunst in Johnson's apartment.

On June 27, 1990, a Portage County deputy sheriff found Brunst's naked corpse near Jones Road in Palmyra Township, near the village of Diamond.  The body was so badly decomposed that the deputy coroner was unable to determine a cause or time of death.  The deputy coroner did however, conclude that "homicidal violence" was involved.

The area where Brunst's body was found had a reputation as a "parkers' spot" and was known to Johnson.  There was testimony that Johnson had been driving there in his truck the previous week.  Near the body, police found a pink sock matching the one found on the floor of Brunst's apartment, a pair of panties of the kind Brunst wore and a piece of carpet from Johnson's truck.  The Bureau of Criminal Identification and Investigation later determined that two fibers found on the panties matched fiber samples from Johnson's truck.

During the late afternoon of June 29, 1990, Detectives Helmut Klemm and Bruce Van Horn of the Akron Police Department interviewed Johnson at his residence in Cuyahoga Falls.  The first thing Johnson said to the detectives was "I'm the killer" and he dared them to arrest him.  Klemm told Johnson he would if Johnson told him how he had killed Brunst.  Johnson then told Klemm he "bashed in her head with a tire iron" and "dumped her" behind the Diamond Post Office.  Klemm told Johnson he knew this story was false "[b]ecause there is no trauma to the body" and at that time, he refused Johnson's invitation to arrest him.  Johnson then claimed to have stabbed Brunst, then to have shot her, and gave "a constant barrage of confessions [and] retractions."  On June 30, police arrested Johnson, who told them at that time:  "If that's what you want to hear, if

that's what you want to say that I did it.  ***  I just want to plead guilty."

Subsequently, Johnson was indicted on two counts of aggravated murder, R.C. 2903.01(A) and (B), each count having two death specifications:  R.C. 2929.04(A)(5) (prior purposeful homicide conviction) and (A)(7) (kidnapping and/or rape).  He was thereafter convicted by a jury of both counts and all specifications.  Upon the jury's recommendation of the death sentence, the trial court agreed and merged the aggravated murder counts.  Upon appeal, the court of appeals affirmed.

The cause is now before this court upon an appeal as of right.

Lynn C. Slaby, Summit County Prosecuting Attorney and Phillip Bogdanoff, Assistant Prosecuting Attorney, for appellee.

David H. Bodiler, Ohio Public Defender, Jane P. Perry and Randy D. Ashburn, Assistant Public Defenders, for appellant.

A. William Sweeney, J.     Upon a careful and thorough review of the record in this case, we are convinced that the number of errors during the guilt phase of defendant's capital trial deprived him of his constitutional due process right to a fair trial.  Therefore, for the reasons that follow, we reverse the judgment of the court of appeals upholding defendant's convictions, and remand the cause to the court of common pleas for further proceedings.

I

In his first proposition of law, defendant contends that his prior conviction for second degree murder in Florida cannot be the basis for convicting him of a R.C. 2929.04(A)(5) death specification.

In 1988, defendant pled guilty to and was convicted in a Florida court of a charge of "murder in the second degree," Fla. Stat. Ann. 782.04(2), for the 1984 beating death of Denise Hutchinson.  Based on the second-degree murder conviction, the jury in the cause sub judice convicted defendant of a death specification pursuant to R.C. 2929.04(A)(5), which allows the death penalty if, "[p]rior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another ***."

R.C. 2901.22(A) states:  "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

On the other hand, Fla. Stat. Ann. 782.04(2) provided: "The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree ***." (Emphasis added.)  Under this provision, Florida equates a "depraved mind" with "malice," defined as "ill-will, hatred, spite, or an evil intent" toward the victim.  State v. Ellison (Fla. 1990), 561 So.2d 576.

Defendant submits that the Florida statute in issue does

not require a "purposeful killing." We agree. Ill will, hatred, spite, and evil intent do not connote specific purpose to kill, and Florida courts have not required the state to prove, in second-degree murder cases, that the defendant meant to kill the victim. Rather, "[s]econd-degree murder convictions have consistently been affirmed when the unintended death resulted from intentional actions toward or directed at a particular victim out of ill will, spite or malice." Ellison v. State (Fla. App. 1989), 547 So.2d 1003, 1006 (citing cases), affirmed in part, State v. Ellison, supra.

A review of several other precedents handed down in Florida support this conclusion. For example, in State v. Bryan (Fla. 1973), 287 So.2d 73, the defendant pistol-whipped the victim; the pistol went off and killed the victim. The Florida Supreme court upheld a second-degree murder conviction without requiring proof of homicidal intent. Similarly, in Dellinger v. State (Fla. App. 1986), 495 So.2d 197 (en banc), the defendant "pointed a rifle at his wife without knowing (and thus without caring) whether or not it was loaded, and then deliberately pulled the trigger, killing her." From that, the jury could "infer Dellinger had a 'depraved mind regardless of human life'." 495 So.2d at 198-199.

In Owen v. State (Fla. App. 1983), 441 So.2d 1111, the defendant was acquitted of first-degree murder but, despite his claim of intoxication, was convicted of second-degree murder. In Florida, "[v]oluntary intoxication is an absolute defense to any crime requiring specific intent," id. at 1114, fn. 6, and the jury apparently found voluntary intoxication. Id. at 1114. It follows, therefore, that specific intent is not essential to support a second-degree murder charge in Florida. See, also, Gentry v. State (Fla. 1983), 437 So.2d 1097.

The state argues that "purpose" under the language of R.C. 2901.22(A) set forth above is not limited to specific intent. In our view, however, this provision does not apply to the Florida statute in issue. The gist of second-degree murder in Florida is not merely "conduct of a certain nature"; the conduct must be accompanied by "ill-will, hatred, spite, or an evil intent." State v. Ellison, supra, 561 So.2d 526. Thus, we believe an "intention to engage in conduct of [a certain] nature" under Ohio law would not satisfy the "depraved mind" element of Fla. Stat. Ann. 782.04(2) Therefore, we find that the 1984 Florida conviction of second-degree murder was insufficient to prove the R.C. 2929.04(A)(5) aggravating circumstance. Accordingly, we sustain defendant's first proposition of law.

## II

## A

In his seventh proposition of law, defendant contends that he was denied a fair trial by the admission of inadmissible hearsay statements purportedly made by the victim.

Prior to her death, Susan Brunst told several people that her brother, the defendant, had tried to rape her in November or December of 1989. The trial court permitted, over defense objections, four witnesses to repeat these statements. The state argued and the trial court apparently agreed that the victim's statements were admissible as statements of state of mind under Evid.R. 803(3) or as excited utterances under Evid.

R. 803(2).

In State v. Huertas (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068, this court held as follows:

"To be admissible under Evid. R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties. ***.'  Potter v.Baker (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus."

Ron Cook testified that on a weekend in 1989 after Thanksgiving, he arrived at the victim's home to find her "noticeably upset."  Cook questioned her, and she told him that defendant had tried to rape her, apparently "within minutes" of Cook's arrival, by trying to force her into the bedroom at knifepoint.  Brunst resisted and was finally able to "talk him out of it."

In our view, the testimony of Cook qualifies as an exception to the hearsay rule as an excited utterance under the standard enunciated in Potter, supra.  Cook testified that Brunst was "upset," and that her statement to him was made within minutes of the incident.  Furthermore it appears reasonable to conclude from the record that these statements were made in a state of nervous excitement, especially given the shocking nature of defendant's alleged actions.  Cf. State v. Taylor (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316, 322. Moreover, even though Cook elicited Brunst's statements by questioning her, we do not believe his questions were coercive or leading.  Nor do we believe Cook's questions destroyed "the domination of the nervous excitement over [Brunst's] reflective faculties."  State v. Wallace (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, paragraph two of the syllabus.  In any event, we believe that the trial court's admission of Cook's testimony in this realm does not amount to an abuse of discretion.  See State v. Jenkins (1984), 15 Ohio St. 3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313.

B

Three other witnesses also repeated the victim's allegation as testified by Cook.  The state does not argue before this court that these statements were admissible, but instead argues harmless error.  The record indicates that the victim's daughter Cynthia related two such statements, but it is not clear at what time the victim made the first of these. Cynthia, however, did not testify that her mother seemed excited or upset; rather, she testified that her mother told her the story for a reason (i.e., so she would stay away from defendant), which would indicate reflection.  The second time the victim told Cynthia about the rape attempt was about a week after the first time.

The victim told her friend Loretta Hopkins virtually the same story "a couple months" after the attempted rape.  Like Cynthia, Hopkins did not testify as to the victim's emotional state, but did state that the victim told her the story for a reason.

The victim also told her sister, June Jones, about the attempted rape "[a] few days" after it happened.  The victim

"was very upset," but Jones did not say she was agitated, excited, or nervous.  Cf. Taylor, supra ("upset" insufficient where declarant made statements several hours after allegedly startling event).

In our view, the trial judge abused his discretion in admitting the testimony of Jones, Hopkins, and Cynthia Brunst. There was no evidence that Susan Brunst spoke to these witnesses under the domination of nervous excitement.  In all three cases, circumstances indicated that Brunst had the opportunity to reflect.  See, e.g., State v. Justice (1994), 92 Ohio App.3d 740, 748, 637 N.E.2d 85, 90:  "A statement naturally becomes more reflective with repetition."

Moreover, the state's argument that any error in admitting Jones's, Hopkins's or Cynthia Brunst's testimony was harmless because their testimony was cumulative to Cook's is wholly unmeritorious.

As noted by the United States Supreme Court, hearsay violates the Confrontation Clause of the United States Constitution unless it comes within a firmly rooted exception or contains other indicia of reliability.  White v. Illinois (1992) 502 U.S.     , 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 859. Thus, any error in admitting this hearsay would be constitutional error.  In order to find constitutional error harmless, this court must find beyond a reasonable doubt that the error did not contribute to the verdict.  Chapman v. California (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711.

Though the inadmissible statements could be characterized as cumulative to Cook's testimony, it is plain that these statements could have affected the verdict.  They corroborated Cook's testimony and bolstered his credibility.  This is significant, because, as testified by Det. Snyder, Cook himself had been a possible suspect in the murder.

Cook was a sometimes jealous (though not abusive) boyfriend to Susan Brunst.  In addition, the record clearly reveals that Cook quickly directed police attention toward Johnson; the defense suggested at trial that Cook did so to divert suspicion from himself.  Thus, the jury might have disbelieved Cook's damaging testimony but for the corroboration.  Moreover, the state's case against Johnson was not overwhelming.  Given that the inadmissible hearsay could have affected the verdict of guilty rendered against defendant, we hold that the testimony of Jones, Hopkins and Cynthia Brunst was not harmless beyond a reasonable doubt.  Therefore, we sustain defendant's seventh proposition of law.

### III

In his eighth proposition of law, defendant argues that he was denied a fair trial by the prosecution's repeated introduction of evidence of his bad acts and bad character. Many of the examples cited by defendant in his brief before this court were not objected to, and any error is therefore deemed to be waived in the absence of plain error.  See, e.g., State v. Johnson (1989), 46 Ohio St.3d 96, 103, 545 N.E.2d 636, 643.  However several instances pointed out by defendant are worthy of merit and were in fact objected to at trial.

Det. Snyder testified that defendant continually referred to women as "whores" or "bitches" during an interview.  Defense

counsel's objection was overruled. Det. Snyder also testified, over objection, that defendant claimed that he and his father "often ha[d] sex together with Loretta [Hopkins]."

The state argues that this testimony indicates defendant's hatred and contempt for women, which tends to explain why defendant murdered his sister. However, we believe hatred of women indicates evidence of a character trait, and under Evid. R. 404(A), evidence of a character trait may not be used to prove that a person "acted in conformity therewith on a particular occasion." In our view, defendant's hatred of women could not be properly used to prove he killed Brunst.

Defendant's ex-girlfriend from Florida, Kathy Keller, testified over objection that defendant had stolen Denise Hutchinson's wallet, whereupon Hutchinson told him "not to come back over anymore." Keller also testified that Hutchinson "used to ask me how could I ever stand for a little son of a bitch like that to touch me."

We cannot find errors in admitting this testimony harmless. The evidence of defendant's guilt in view of the entire record is weak. See State v. Webb (1994), 70 Ohio St.3d 325, 335, 638 N.E.2d 1023, 1032-1033. In addition, the epithet "son of a bitch" was undoubtedly inflammatory.

Defendant's sister, June Jones also provided clearly objectionable character testimony: "*** Mike was a pay back kind of person." She added that her mother accused defendant of threatening Susan's life before her disappearance. The defense objected, and the trial court asked the jury to disregard, adding: "That's not a proper response." However, the court also said, "You can form your own decision about what her testimony has been and so on."

Juries are presumed to follow the court's instructions, including instructions to disregard testimony. See State v. Zuern (1987), 32 Ohio St.3d 56, 61, 512 N.E.2d 585, 590. However, the trial court's instruction in this instance was more confusing than curative. Essentially, the trial court noted an improper response, but undercut its cautionary statement by apparently leaving it up to the jury to determine whether the improper testimony was credible or not. In doing so, the trial court clearly erred to the prejudice of defendant in not properly admonishing the jury to ignore the improper testimony. Cf. State v. Allen (1987), 29 Ohio St.3d 53, 55, 29 OBR 436, 438, 508 N.E.2d 199, 201 (instructions insufficient to cure error of revealing defendant's prior convictions to jury).

The errors complained of under this and the previous proposition of law prejudiced the right of defendant to a fair trial and thus compel a reversal of his conviction.

IV

In his sixth proposition of law, defendant contends he was also prejudiced by the admission of an irrelevant and highly prejudicial letter he had written to the victim on April 4, 1989.

Over objection, the state introduced a letter defendant wrote while in jail in Florida. During her testimony, Cynthia read aloud a passage from the letter describing the victim, her sister June and Cynthia as "a perfect 10" and asking whether "there [are] any women *** who look as good as my sisters or my

niece Cindy."  Another part of the letter from defendant disparaged an ex-girlfriend's age and sexual attractiveness in graphically gross language.  While this passage was not read to the jury, it was not deleted from the exhibit either, despite defense objections.

Once again, we believe defendant raises a legitimate error that occurred during the course of the proceedings below.  The passage regarding his ex-girlfriend should have been deleted since it was irrelevant and unduly prejudicial to defendant, given its offensive sexual content.  Allowing the jury to see this letter with this passage was not harmless error, especially in light of the weakness of the evidence in this case and the state's undue reliance on impermissible character evidence in its prosecution of defendant's capital trial.  Accordingly, this proposition of law also has merit.

Upon a careful review of the entire trial transcript, we note that defendant's convictions were secured largely on the basis of circumstantial evidence.  While circumstantial evidence inherently possesses the same probative value as direct evidence, State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the circumstantial evidence of defendant's guilt in this case is far from overwhelming.  Without overwhelming evidence of guilt, we cannot know what the verdict might have been had the jury not been influenced by errors that in our judgment denied defendant his due process right to a fair trial.  See, generally, State v. Keenan (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.

Accordingly, based on all the foregoing, we sustain defendant's first, sixth, seventh and eighth propositions of law, reverse the judgment of the court of appeals upholding his convictions, and remand the cause to the trial court for further proceedings in accordance with law.

Judgment reversed<br>and cause remanded.

Moyer, C.J., Wright and Pfeifer, JJ., concur.
Douglas, Resnick and F.E. Sweeney, JJ., dissent.