¶ 1 For the reasons set forth in the opinion below, I respectfully dissent from the majority and would reverse the judgment of the trial co urt based on the impermissible use of other acts character evidence.
 {¶ 2} Today, the majority of a panel of this court finds no error in the admission of evidence of prior threats, prior acts of violenc e and general bad behavior committed by defendant-appellant Shannon Brown. Specifically, the majority finds that the aforementioned character evidence, "describing prior threats and acts of violence predicated upon [Shannon's] jealousy, possessiveness, and need to control [Jeremy] tends to undermine her passive portrayal of her role in the altercation and supports the conclusion that the act of swinging the knife was conduct prompted by an awareness or desire that her actions would inflict physical harm upon him." (Emphasis added.) The majority's finding does not state that the testimony regarding prior threats and prior bad acts were used to prove Shannon's motive, or that the other acts demonstrated how the stabbing was not an accident but intentional. Rather, the majority states, just as the prosecution suggested to the jury below, that Shannon's "jealousy, possessiveness, and need to control" support a finding of guilt. It is my position, that the majority's finding contravenes well-stated Ohio law that permits the use of character evidence in limited and specific circumstances.
Facts
 {¶ 3} Though I generally agree with the majority's statement of facts, I will reemphasize the facts I believe to be pertinent to my dissent. On May 25, 2001, somewhere between 3a.m. and 5a.m., defendant-appellant Shannon Brown stabbed her boyfriend, Jeremy Holsinger in the chest with a kitchen knife, thereby causing his death. Shannon did not then, nor does she now, deny her role in Jeremy's death. Indeed, in the hours directly following the incident, Shannon gave police two taped statements detailing the events that lead to the stabbing. Thereafter, at trial, Shannon offered testimony consistent with her original statements to police. The following is Shannon's version of events.
 {¶ 4} In the early morning hours of May 25, 2001, Shannon Brown and Jeremy Holsinger were alone in the living room at 632 Sugar Street watching television. The couple's three housemates, Sam Toland, Lana Manley and Ray Osborne, were in bed sleeping. Shannon testified that she and Jeremy began to argue when he accused her of flirting with and "wanting to be with" their next door neighbor, Eric. The argument escalated quickly so Shannon decided to leave 632 Sugar Street and walk to her Mother's house, located just a few blocks away.
 {¶ 5} As Shannon moved to exit the house through the back door in the kitchen, Jeremy grabbed Shannon by her ponytail, swung her around, hit her in the face and told her she was not going anywhere. Shannon testified that the force of the blow caused her to stumble and brace herself on the stove where she saw a butcher block of steak knives. Shannon stated that, with little thought, she grabbed a knife out of the block to scare Jeremy so that he would not hit her again. When she turned around she saw that Jeremy was heading into the other room, so she decided to run out of the house through the back door and head to her mother's. Shannon was still clutching the knife in her hand as she ran out the back door.
 {¶ 6} Thereafter, Shannon testified that Jeremy followed her into the back yard, where he again grabbed her by her hair. Shannon testified that this time, as she came around to face him, she fell into him, somehow stabbing him. Shannon told the police that the stabbing was an accident and that she never intended to cause Jeremy physical harm. Police photos of Shannon's bruised and swollen face taken by police on May 25, 2001 were entered into evidence in addition to photos depicting a jostled stove next to a butcher block of knives.
 {¶ 7} At trial, the prosecution challenged Shannon's testimony by presenting an alternative version of events to the jury. This version was based on Shannon's alleged fear of losing Jeremy. According to the prosecution, on the night of the stabbing, Jeremy terminated his relationship with Shannon, causing her to erupt into a murderous rage. In the exact words of the prosecution, Shannon had been a "time bomb waiting to go off" and the break-up lit the fuse. In this theory, Jeremy broke off his relationship with Shannon and then went to the couple's room located in the garage to pack his bags. In order to stop him from leaving her, Shannon stabbed Jeremy in the back yard. As an alternative theory to this alternative, the prosecution told the jury that even if Shannon's version were true, it could prove Shannon turned around with the intent to stab Jeremy.
 {¶ 8} Having no physical evidence to support its theory and faced with the fact that the last time anyone saw Shannon and Jeremy they were laughing happily and planning on moving away together the very next day, the prosecution turned to the only evidence remaining that would lend support to its theories — Shannon's ghastly character. To this end, the prosecution called twenty witnesses. Three witnesses had contact with Jeremy and Shannon during the hours before the stabbing.[47] Six witnesses consisted of the emergency or medical personnel who came into contact with Shannon and Jeremy during the hours after the stabbing.[48]
The remaining eleven witnesses had no contact with the defendant or the victim on the day of the stabbing and in most cases, the witnesses had not seen or heard from Shannon or Jeremy for weeks or months.[49] The State called these eleven witnesses for the sole purpose of testifying as to Shannon's prior bad acts. The following is a summation of that testimony.
 {¶ 9} Lana Manley, Shannon and Jeremy's housemate, testified that several weeks prior to the stabbing she witnessed Shannon "smack" Jeremy during an argument. She also saw Shannon throw clothes, beer bottles and furniture during the same argument. Lana testified that on another occasion, over a month before the stabbing, Shannon said that she was going to "beat up" another girl who was seeing Jeremy romantically. Finally, Lana testified that Shannon told her she "busted" another girl's window in an attempt to beat the girl up.
 {¶ 10} Sam Toland, Jeremy's cousin and housemate, testified that six months prior to the stabbing Shannon admitted to "busting" out the same window Lana testified to. Shannon allegedly told Sam she was going to kill Jeremy.
 {¶ 11} Amy Cutchall, an emergency room physician's assistant, testified that two weeks prior to the stabbing she treated Shannon for a broken hand. Amy told the jury that Shannon's injury looked like a "boxing" type break and that Shannon had explained to her that she and Jeremy, who stood by her side during the examination, had been boxing.
 {¶ 12} Ray Osborne, another housemate, testified that Shannon once told him that if she couldn't have Jeremy, "no other bitch could have him," and that if Jeremy ever left her she didn't know what she'd do. Ray also told the jury that Shannon admitted to hitting Jeremy in the head, thereby breaking her hand.
 {¶ 13} Jessie Howard, Jeremy's cousin, testified that he saw Shannon hit Jeremy once or twice, but could not recall the specific circumstances. He also heard Shannon tell Jeremy, "If I can't have you no one will have you."
 {¶ 14} Kira Holcomb, one of Jeremy's former girlfriends, testified that two months prior to the stabbing, Shannon left threatening messages on her voice mail telling her "stay away from Jeremy." Kira also alleged that in those same messages Shannon threatened to "walk down to my house and beat my ass." Additionally, Kira claimed Shannon intended to "rip my ass" and that if she didn't stay away from Jeremy "she was going to kill me."
 {¶ 15} Melissa Breidenstein, Shannon's cousin, told the jury that she started dating Jeremy while he and Shannon were living together. Melissa explained that when Shannon discovered what was going on, she threatened to "stomp my brains in and that I'd better have the police and an ambulance waiting for me because they wasn't going to be able to identify my body when she was done with me." Melissa also alleged that Shannon said she was going to kill her unless she broke up with Jeremy. Melissa ended her testimony by telling the jury that she was "terrified" of Shannon and her whole family.
 {¶ 16} Lindsay Tinnerello, also a former girlfriend of Jeremy's, took the stand next and gave another account of the threats on Kira Holcumb's voice mail. Additionally, Lindsay told the jury that "last Christmas" she heard Shannon tell Jeremy, "If you ever break up I will kill you."
 {¶ 17} Trevana Holsinger, Jeremy's grandmother, testified that she heard Shannon say to Jeremy, "shut your fucking mouth or I will kill you." She also testified to seeing Shannon shove Jeremy on various occasions.
 {¶ 18} Jeri Toland testified that seven months prior to the stabbing, she and Jeremy were at her house watching television when, "Shannon had come over, was beating on my door trying to get into my apartment to get me and Jeremy because we were together and she bused out my kitchen window and was kicking my door, punching my door, and Jeremy was trying to talk to her through the upstairs bedroom window because I didn't have any screens in there, and she was yelling saying she was going to beat us up and kill him, kill Jeremy, and stuff like that."
 {¶ 19} Patrolman Thomas, of the Marion Police Department, testified that he responded to a broken window at Jeri Toland's house and that Jeri told him that she did not know who did it.
 {¶ 20} Lori Hummel, Jeremy and Shannon's former neighbor, testified to an occasion on which Shannon admitted to spray-painting Jeremy's clothing when she discovered that he had taken one of her credit cards without permission. Additionally, Shannon told Lori she was going to "beat the fuck out of him."
 {¶ 21} Jennifer Jordan, also a former neighbor and according to her, a former girlfriend of Jeremy's, told the jury that she was sitting on the porch at Jeremy and Shannon's house talking to Jeremy, when Shannon showed up and told Jennifer to go home. Jennifer testified that Shannon told Jeremy to "get in the house and he wasn't allowed to talk to us."
 {¶ 22} Finally, Homer Young, Jeremy's uncle, took the stand and testified that he also heard Shannon tell Jeremy, "shut your fucking mouth or I will kill you." He also heard her say, "If I can't have you Jeremy, no one will."
 {¶ 23} I would be remiss if I failed to mention a few facts that are generally extraneous to my dissent, but nevertheless offer some perspective into the framework of this case. As discernable from the list of witnesses above, ten of the twenty witnesses called by the prosecution were either related to Jeremy by blood or had engaged in a romantic relationship with Jeremy at some point prior to his death. Often, these romantic relationships transpired simultaneous to his relationship with Shannon. The majority of the prior bad acts testimony, and the most damaging, was delivered via these ten witnesses.
Legal Standard for Other Acts Evidence
 {¶ 24} Inherent in an analysis of other acts testimony is the understanding that Evid.R.404 is a rule of relevancy; a rule that states that a person's character is always irrelevant to the issue of guilt. "An accused cannot be convicted of one crime by proving he committed other crimes or is a bad person." State v. Jamison (1990), 49 Ohio St.3d 182,184, 552 N.E.2d 180. The danger imposed by character evidence is the likelihood that the jury will speculate that since the defendant has shown a propensity for committing criminal or bad acts in the past, he probably committed the present crime. "The result is a potential for prejudice with respect to not only the weighing of the evidence but also the creation in the jury's mind of an urge to punish for past acts."State v. Griffin (2001), 142 Ohio App.3d 65, 71, 753 N.E.2d 967, citing Lily, the Law of Evidence (1978) 124, Section 43.
 {¶ 25} The bulk of the testimony rendered at Shannon's trial was comprised of prior threats, prior assaults and prior bad behavior. Evidence of other acts committed by a criminal defendant will sometimes be admissible but, "not because it shows that the defendant is crime prone, or even that he has committed an offense similar to the one in question, but in spite of such facts." State v. DeMarco (1987),31 Ohio St.3d at 194, quoting State v. Burson (1974), 38 Ohio St.2d 157, 158,311 N.E.2d 526. (emphasis added) Furthermore, even if the other acts evidence is relevant to some other material issue at hand, it shall be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. State v. Harrington, Logan App. No. 8-01-20, 2002-Ohio-2190; R. 403(A).
 {¶ 26} Thus, in order for the plethora of testimony regarding Shannon's threats, assaults, and bad behavior to be deemed admissible, they had to have been proffered for some other purpose as identified in Evid.R. 404(B) and R.C. 2945.59. Shannon confessed to stabbing the victim within moments of doing so. Thus, Shannon's identity as Jeremy's killer is not a material issue. Rather, the material issue is whether or not Shannon stabbed Jeremy knowingly as opposed to accidentally as she claims.[50] Evidence tending to show the absence of an accident on Shannon's part, or that she intended to stab Jeremy, would therefore be admissible despite any possible character implications and provided that the probative value of the evidence outweigh any prejudicial impact.
The Relevancy of Other Acts Evidence
 {¶ 27} The state and the majority opinion collectively refer to the evidence of Shannon's prior threats, assaults and bad behavior as evidence of either motive or intent. While I agree that the issue of Shannon's intent or the absence of an accident on her part is material in this matter, I would examine the prior threats, assaults and general prior bad behavior individually for compliance with the stated law. By viewing the other acts evidence as one lump occurrence, the majority fails to differentiate between threats issued against Jeremy and threats issued against others. Moreover, the majority fails to identify the connection between prior "shoves" and "slaps," to the intent to assault with a deadly weapon.
 {¶ 28} By looking at each instance of other acts evidence, the majority would see, as do I, that Shannon's prior threats issued in anger to women she believed to be having clandestine relations with her significant other have no permissible relevance to whether or not several weeks or months later, Shannon knowingly stabbed that significant other with a kitchen knife during a heated argument. This much was established over fifty years ago in State v. Moore (1948), 149 Ohio St. 226,78 N.E.2d 365, where the Supreme Court of Ohio determined that "threats made by a defendant against a particular person with whom he had a quarrel sometime previously, were not admissible against him in his trial for killing another person in a different quarrel, there being no relation between the two incidents." Id. at 230 citing, Warren onHomicide (Perm.Ed.), 295, 491, Sections 199, 210; Wharton's CriminalEvidence, 11th Ed., 363, Section 283; 26 American Jurisprudence, 404, Section 359; 40 Corpus Juris Secundum, Homicide, §§ 238, 241; Bird v.United States (1901), 180 U.S. 356, 21 S.Ct. 403, 45 L.Ed. 570.
 {¶ 29} The doctrine regarding the irrelevance of threats made against third parties in dissimilar situations remains good law. In Statev. Bayless (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, CertiorariGranted, Judgment Vacated on Other grounds by 438 U.S. 911,98 S.Ct. 3135, 57 L.Ed.2d 1155, the Supreme Court of Ohio concluded that in a prosecution for aggravated murder, testimony as to threats made by the defendant against a third person subsequent to the killing, which did not involve the deceased and formed no part of the murder affair was inadmissible in evidence against the defendant. In that case, the trial court had allowed the prosecution to ask the defendant whether on one occasion the defendant had told a deputy "(t)hat he was a dead man when you got out: if you couldn't do it, your people would," and whether on another occasion the defendant had threatened a deputy by saying "you were going to kill him if you had to do it with your bare hands."
 {¶ 30} Thereafter, Bayless denied making either threat in those terms and only admitted to making angry statements. In response, the prosecution called the two deputies as rebuttal witnesses and was allowed, also over objection, to introduce testimony of the two deputies that the alleged threats were in fact made. The Supreme Court determined the questions put to the defendant and the rebuttal testimony to be "plainly error" and "irrelevant to any issue in the case and was not admissible under R.C. 2945.59. Id. at 106; citing State v. Moore, supra. Additionally, the court determined that it was immaterial to their conclusion that Bayless issued the threats subsequent to the killing for which he was on trial. Like the threats in Bayless, the threats issued to Kira Holcumb, Melissa Briedenstien and Jeri Toland are not relevant to any matter at hand. Shannon did not threaten nor attempt to stab any of these witnesses. That the threats were issued in response to an argument over Jeremy is not enough to establish their relevance. Jealousy is an emotion and does not establish that Shannon intended to stab Jeremy. The only useful purpose of threats issued to Kira, Melissa and Jeri was to illustrate Shannon's violent nature to the jury.
 {¶ 31} Next, I would find instances in which Shannon broke a window, rudely told a neighbor to go home and spray painted Jeremy's clothing to be even more irrelevant to proving her intent to stab Jeremy. In State v. Johnson (1994), 71 Ohio St.3d 332, 1994-Ohio-304,643 N.E.2d 1098 the Ohio Supreme Court held that testimony indicating a defendant's hatred and contempt of women was inadmissible as evidence of the defendant's reasons for killing his sister. Id at 340. Additionally, in State v. Gillard (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, rehearing denied 41 Ohio St.3d 723, 535 N.E.2d 315, certiorari denied109 S.Ct. 3263, 492 U.S. 925, 106 L.Ed.2d 608, overruled on other grounds by Statev. McGuire, 80 Ohio St.3d 390, 686 N.E.2d 1112, 1997-Ohio-335 the Supreme Court found that the other acts testimony of a witness regarding a murder defendant's attack on individual in bar was irrelevant and tended to portray defendant as a violent man. Here, Shannon's dislike of the women Jeremy was dating, and the ways in which she went about displaying that dislike, are irrelevant to showing Shannon's intent or the absence of accident on the night of the stabbing. Shannon has not been accused of killing one of Jeremy's former girlfriends. What's more, there is no evidence that Jeremy was leaving Shannon for another woman. Shannon's issues with other woman do not demonstrate that she would intentionally stab Jeremy.
 {¶ 32} The majority opines that the evidence as proffered by the prosecution demonstrates Shannon's situationally specific emotional reactions. I do not believe that any member of this court maintains the proper credentials that would qualify them to label or identify Shannon's emotional reactions as being similar or dissimilar from one moment to the next. In any event, the prosecution did not use Shannon's prior threats or bad acts to demonstrate any similarity in her responses to anger. On the contrary, the prosecution attempted to show a pattern of escalating reactions by describing Shannon as "a time bomb waiting to go off." The prosecution drew a picture of Shannon as a ticking bomb in the jury's mind, and thereafter used the countless instances of other acts testimony to give life to that image. Despite its position now on appeal, the trial transcript is clear. The state used evidence of Shannon's prior bad acts as substantive evidence of her guilt.
 {¶ 33} The majority relies on State v. Newcomb, Logan App. No. 8-01-07, 2001-Ohio-2325, in which this court held that testimony describing intoxicated conflicts, predicated upon the defendant's jealousy and violent reactions to the victim's alleged relationships with other men, was admissible proof of the defendant's motive and why he would have a desire to seriously injure or kill the victim. First of all, I reject the suggestion that motive is material in this case. The prosecution's theory that Shannon stabbed Jeremy because he broke off their relationship is mere speculation, for which there is no supporting evidence.[51] Secondly, the facts sub judice are distinguishable from the Newcomb decision. In Newcomb, the defendant was on trial for aggravated murder and denied his identity as the killer. What's more, the other acts testimony admitted in Newcomb were acts of extreme physical violence rather than random threats or a few shoves or slaps. Furthermore, in Newcomb, the defendant alleged that someone other than himself inflicted the victim's past injuries in addition to killing her. Therefore, this court held that evidence of circumstances in which Newcomb had previously beaten the victim and the severity of the injuries he inflicted were relevant to rebut these contentions and to prove that Newcomb, rather than his brother, had inflicted the fatal injuries. Id. citing State v. Tillett (June 24, 1999), Cuyahoga App. No. 74275, dismissed, appeal not allowed by (1999), 87 Ohio St.3d. Unlike Newcomb, the issue here is not whether Shannon set out to kill Jeremy on May 25, 2001, but whether the stabbing was an accident. Shannon does not deny causing Jeremy's injuries and does not blame the incident on someone else.
 {¶ 34} In conclusion, after a thorough examination of the testimony, I would at the very least find error in the admission of (1) prior threats allegedly issued against Jeremy's former girlfriends, (2) testimony that Shannon allegedly broke Jeri Toland's window, (3) testimony that Shannon spray painted Jeremy's clothes, (4) testimony that Shannon told Jennifer Jordon that she could not talk to Jeremy and had to go home, and (5) testimony from Patrolman Thomas stating that he investigated a broken window at Jeri Toland's house. Therefore, the next issue I would address is whether those errors amounted to reversible error or were otherwise harmless.
Preservation of Error for Review
 {¶ 35} Before finding no error in the admission of prior bad acts, the majority first determined that even if error was present, all but plain error was waived by the defense counsel's failure to object at trial. Again, I respectfully disagree.
 {¶ 36} Prior to trial, Appellant-Defendant filed a motion in limine, requesting that all other acts evidence of prior bad acts, including alleged threats and acts of violence be excluded. According to the motion, the state's proposed evidence was incredible, more prejudicial than probative and far removed from the circumstances surrounding the stabbing on May 25, 2001. According to the State, Shannon's threats of bodily harm were "a repeated occurrence that happened all the time. And it's a continued pattern that relates directly to what Shannon's motive was." The prosecution would later change its position and allege that the other acts testimony was probative of Shannon's intent or to show the absence of accident.
 {¶ 37} As it considered Appellant's motion, the trial court noted that Shannon was on trial for murder rather than aggravated murder and therefore precalculation and premeditation were not at issue. The court went on to read Evid.R.404(B), stating that evidence of prior bad acts was admissible to show motive, intent, knowledge, mistake or absence of accident. In light of that, the trial court determined, "from what I have read thus far, from what I have heard, my feeling is that this stuff is going to come in." The court thereafter denied Appellant's motion with the caveat that she could renew her objection at trial but stated, "My guess is, and my suspicion is going to be that that stuff is going to come in."
 {¶ 38} At that point, the case proceeded to trial and the state presented its "time bomb" theory to the jury. Midway through the state's case in chief, after five witnesses had testified to various prior bad acts committed by Shannon, the following dialog took place outside of the jury's audible range:
 {¶ 39} "Defense Counsel: I want to renew our Motion in Limine, all these people coming in here saying that they have heard these threats * * *, for whatever the Court thought it was worth initially, we didn't think it was admissible, the Court did. This is cumulative is all it is."
 {¶ 40} "The State: It's not cumulative. You're disputing the accuracy of — so clearly it's not cumulative."
 {¶ 41} "The Court: You made your record. Lets go."
 {¶ 42} Today, the majority concludes that this exchange did not preserve error with respect to the first four witness who testified to bad acts and therefore, all but plain error was waived with regard to any perceived errors in their testimony. State v. Agner (1999),135 Ohio App.3d 286, 294, 733 N.E.2d 676. However, the majority then goes on to conduct a plain error analysis that encompasses testimony and perceived error admitted into evidence after the renewal of the motion in limine. According to the majority, anything testified to after to the renewal was "related to the same events and merely provided a factual background for otherwise unchallenged testimony."
 {¶ 43} Contrary to the majority's characterization of the renewal motion, I would find the aforementioned exchange between the trial court and counsel to be a proper renewal of the pre-trial motion in limine. Irrespective of the testimony already admitted, the renewal of the motion in limine was sufficient to enable the trial court to make a final determination as to the admissibility of future testimony regarding prior bad acts. The rule requiring counsel to renew objections raised in a motion in limine exists so that trial courts have the opportunity to consider the objected evidence in the context of the actual trial and to enter the objection into the record. Here, the trial court was given the opportunity to reconsider its prior ruling. The court chose not to do so and indicated that Shannon's objection to the threats were on the record. For an appellate court to refuse to honor that renewal as a proper objection is counterproductive and inherently unfair.
 {¶ 44} Consequently, for purposes of determining the appropriate standard of review for any perceived errors alleged by the Appellant, I would dissect the trial into two distinct parts; pre and post renewal of the motion in limine. Thus, I would agree with the majority that all but plain error was waived with respect to prior bad acts and prior threats attested to by Lana Manley, Sam Toland, Ray Osborne, Amy Cutchall and Jessie Howard. However, the renewal of the motion in limine was sufficient to preserve objections to prior threats thereafter attested to.
 {¶ 45} Subsequent to the renewal of Shannon's motion in limine, nine witnesses took the stand to testify almost exclusively to Shannon's prior bad acts. As previously discussed and stressed above, several witnesses attested to multiple incidents of bad acts. Most incidents were not reiterations of testimony proffered before the renewal, but new incidents and new details, thus ruling out the notion that any errors subsequent to the renewal were cumulative to any testimony admitted prior to the objection and therefore harmless. For instance, new to the jury was Kira Holcumb and Lindsay Tinnerello's testimony regarding Shannon's alleged voice mail threats, Melissa Briedenstein's account of Shannon's threats, Jennifer Jordon's porch debacle, Lori Hummel's spray paint incident and Jeri Toland's detailed account of her broken window. Therefore, I would examine all instances of prior bad acts admitted after the renewal for harmless or reversible error.
Harmless or Reversible error
 {¶ 46} A trial court's improper admission of other acts evidence requires a reversal of a conviction if there is a reasonable possibility that the evidence contributed to the conviction. State v. Clemons
(1994), 94 Ohio App.3d 701, 711, 641 N.E.2d 778, 784-785; State v.Elliott (1993), 91 Ohio App.3d 763, 771, 633 N.E.2d 1144, 1148-1149. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Crim.R. 33(E)(4); Crim.R. 52(A). Error is harmless beyond a reasonable doubt if the remaining evidence standing alone constitutes overwhelming proof of defendant's guilt. State v. Williams (1983) 6 Ohio St.3d 281,452 N.E.2d 1323; State v. Moreland (1990) 50 Ohio St.3d 58, 552 N.E.2d 894.
 {¶ 47} Here, the evidence of defendant's guilt in view of the entire record is weak. There are no witnesses to the stabbing, visually or audibly. As far as anyone knew, as of the day of the stabbing, Shannon and Jeremy were getting along and planning on moving away together. The physical evidence comports with Shannon's version of events. Shannon's face was bruised when she was arrested but according to Lana Manley it was not bruised when she went to bed. Crime scene photographs reveal a disheveled kitchen with a stove that appears to have been jostled. A butcher block of steak knives is positioned on the countertop immediately to the right of the stove. Also, a blood trail indicates the stabbing took place in the backyard, not far from the back door. Shannon admitted to stabbing Jeremy immediately, never denying it, and her story remained consistent during her testimony at trial.
 {¶ 48} The state's most compelling testimony was that of the surgeon who operated on Jeremy in an attempt to save his life. The surgeon testified that the stab wound must have been delivered in a downward motion in order to cause the damage that it did. However, on cross examination, the doctor admitted that he had no way of knowing Jeremy's body position when the blow was delivered and therefore could not say for sure how the wound was inflicted. Other evidence presented by the state included a necklace found in the back yard, a crushed telephone found in the alley next to the house, and Jeremy's packed belongings. I am baffled as to the relevance of the first two pieces of evidence and find the third to be consistent with that of a person moving away.
 {¶ 49} Undoubtedly, this case hinged on credibility; on whether or not the jury believed Shannon's version of events. I would find the volume of improperly admitted testimony concerning threats, physical assaults and bad behavior to have created a situation in which it is impossible to suggest that the jury did not use that impermissible evidence to gage Shannon's credibility. The errors are exacerbated by the fact the prosecution practically begged the jury to consider Shannon's character and that court did not deliver a limiting instruction regarding the proper use of other acts testimony. Therefore, I would not find the error to be harmless beyond a reasonable doubt.
 {¶ 50} Furthermore, assuming arguendo that Shannon's trial counsel failed to preserve error with respect to some or all instances of other acts testimony, the collective error in this matter amounts to plain error. Plain error exists where the outcome of the trial would clearly have been different but for the error. State v. Biros (1997),78 Ohio St.3d 426, 431. The plain error rule must be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. State v. Cooperrider (1983),4 Ohio St.3d 226, 227. As I have pointed out, the evidence of Shannon's guilt was weak and the amount of error great. Had the jury not heard the inadmissible character testimony I do not believe there was adequate evidence such that a jury would have been able to find Shannon guilty of intentionally stabbing Jeremy, beyond a reasonable doubt.
 {¶ 51} Accordingly, I would sustain Appellant's first assignment of error, rendering the consideration of the remaining assignments unnecessary. I would then reverse the judgment of the trial court and remand the action to that court for new trial.
[47] Lana Manley, Sam Toland, Ray Osborne.
[48] Dr. Beasley, surgeon; Cheryl Shortred, records custodian; Larry Tate, coroner; Patrolman Isom, second officer on scene; Patrolman Wiggins, first officer on scene; Det. Scott Sterling; investigator.
[49] Amy Cutchall, Jessie Howard, Kira Holcumb, Melissa Breidenstein, Lindsay Tinnerello, Trevanna Holsinger, Jeri Toland, Patrolman Thomas, Lori Hummel, Jennifer Jordon, Homer Young
[50] I disagree with the majority that the reasonableness of Shannon's belief that danger was imminent was a material issue. Shannon never asserted that she stabbed Jeremy in self defense, only that she grabbed the knife in self defense. Shannon was not on trial for holding a knife in her hand. I recognize that the prosecution continually discussed self defense at trial and that a self defense instruction was delivered to the jury. I find this to be perplexing and can only imagine the confusion it must have caused for the jury.
[51] The state claims that Jeremy's belongings were packed indicating that he was leaving Shannon. However, numerous witnesses confirmed that Jeremy and Shannon were moving in to a trailer in Southern Ohio the next day.