[Cite as *State v. Aeschilmann*, 2014-Ohio-4462.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Sheila G. Farmer, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2013CA00192 |
| ALAN J. AESCHILMANN | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal appeal from the Stark County
Court of Common Pleas, Case No. 2013-
CR-0287

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      October 6, 2014

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

JOHN FERRERO      JAMES BURDON
Stark County Prosecutor      137 South Main Street
By: RONALD MARK CALDWELL      Suite 201
Assistant Prosecuting Attorney      Akron, OH 44308
110 Central Plaza South, Ste. 510
Canton, OH 44702

*Gwin, P.J.*

{¶1}    Appellant Alan J. Aeschlimann ["Aeschlimann"] appeals his convictions on one count of felony murder and one count of child endangering for the death of two-year-old Bri'Sean T. Gamble on October 19, 2011.

*Facts and Procedural History*

**A. The Parties**

{¶2}    Aeschlimann, also known as "A.J." was a 28-year-old divorced father and sole custodian of his 4-year-old daughter Hannah. He withdrew from Kent State University to begin employment with the Ohio Department of Youth Services at the Indian River Correctional Facility where he had served for 5 years as a corrections officer. Brittany Boitnott was a 24-year-old single parent of 2 1/2 year old Bri'Sean Gamble. A romance developed between Brittany and Aeschlimann in May of 2011 and in September of that same year Brittany and Bri'Sean moved into the residence occupied by Aeschlimann and Hannah. In August of 2013, at the time of the trial, Aeschlimann was married and residing with his wife Amanda Aeschlimann.

**B. The Home**

{¶3}    Aeschlimann's home was small with a living room, kitchen, and three bedrooms, one of which was vacant because Aeschlimann's ex-wife had removed all the furnishings. Bri'Sean and Hannah slept in separate bedrooms at the end of the hall and across the hall from one another. Because they had no bedroom furniture of their own, Aeschlimann and Brittany slept on the living room couch together. Aeschlimann slept with his back to the backrest of the couch and Brittany with her back to Aeschlimann stomach, heads going the same direction.

### C. Wednesday, October 19, 2011

{¶4}     During the period that Aeschlimann, Brittany and the two children lived together, their daily routines were consistent and predictable. Brittany was unemployed and stayed home with the two children except on those days Hannah attended preschool or visited her paternal grandparents. Hannah attended Oak Park Preschool three to four times per week.

{¶5}     Wednesday, October 19, 2011 was no different. Aeschlimann awoke at approximately 7:30 a.m., as did Brittany. They ate breakfast together and Aeschlimann left for his usual work shift at 1:45 p.m. to 10:00 p.m. Hannah did not attend preschool that day. Brittany, Bri'Sean and Hannah stayed home all day. The only visitors were Aeschlimann parents who stopped by with groceries a little after 8:00 p.m. staying for approximately 20 minutes. According to Jody Aeschlimann, Hannah's grandmother, she noticed nothing unusual about the children but did observe that Brittany appeared upset.

{¶6}     Brittany testified that she fed Bri'Sean, and gave him a bath around 9:15 p.m. She then put Bri'Sean to bed at between 10:00 and 10:15 p.m., which was his normal bedtime. She further testified that Aeschlimann was not yet home from work when she put Bri'Sean to bed and that was normal.

{¶7}     Aeschlimann's memory of those events was consistent. He recalls leaving work at 10:00 p.m. and arriving home approximately 10 minutes later. An excited Hannah greeted him and, although he could see Brittany in the back of the hall, he did not see Bri'Sean at all. He further observed that Bri'Sean was usually already in bed when he returned from work.

{¶8}   Shortly after Aeschlimann's arrival home, and as he played with Hannah in the living room, Brittany left in Aeschlimann's car to go to Wal-Mart. The car was actually owned by Aeschlimann's parents, and Brittany was not insured to drive it. Aeschlimann testified that she had never driven his car before. Brittany testified that she had driven this car in the past. Aeschlimann testified Brittany had called him at work several times that day; however, she did not ask him to stop at Wal-Mart on his way home even though it was located across the street from his place of employment. Brittany testified that she left for Wal-Mart at "10:15, 10:20" -- "probably a little later" and "at the latest 10:20-10:25" returning home a little before 11:00 p.m.

{¶9}   While Brittany was at Wal-Mart, Aeschlimann remained home with Hannah while Bri'Sean remained in his bedroom. Brittany and Aeschlimann each testified that Bri'Sean had "good sleeping habits". When Brittany returned Hannah was still awake. Hannah stayed awake until approximately 11:00 p.m. for two reasons. First, to give her time to interact with her father and second, because Aeschlimann's custody agreement included the right of her non-custodial mother to make a nightly phone call. In fact, her mother made her nightly call at approximately 10:20 p.m. and Aeschlimann monitored the content of the conversations.

{¶10}   At 11:00 p.m., Brittany returned from Wal-Mart. Aeschlimann put Hannah to bed between 11:00 and 11:30 p.m. Aeschlimann and Brittany went to sleep on the couch and awakened together the next morning. Brittany concedes that no one got up during the night and Detective Von Spiegel concluded that no one had contact with Bri'Sean throughout the night.

**D. Bri'Sean's Body is Discovered**

{¶11} The next morning Aeschlimann and Brittany awakened and resumed their predictable routines. Aeschlimann took Hannah to preschool at 9:00 a.m., where they both met and spoke with her teacher Samantha Carr. Ms. Carr testified that neither demonstrated unusual conduct. Aeschlimann returned home at 10:00 a.m. Bri'Sean had not awakened by the time Aeschlimann returned which was beyond his normal arising time of 9:30 a.m. Brittany entered his bedroom at 10:30 a.m. and found his lifeless body. A frantic and emotional 9-1-1 call was played for the jury.

**E. EMS Arrives.**

{¶12} EMS technicians arrived along with a Deputy from the Stark County Sheriff's Office. En route dispatch informed the technicians that a two-year old child might be in cardiac arrest and a possible choking. Upon arrival, Brittany came running from the house, followed by Aeschlimann. Brittany had Bri'Sean in her arms and was crying hysterically.

{¶13} EMS firefighter/paramedic Jennifer Mohler testified that the child was pulse less and apenic. (1T. at 62). He had rigor mortis or "stiffening of his jaw, his shoulder, his knees." (1T. at 63). According to Mohler, this meant that the child had been gone too long and resuscitation was futile. The medical personnel at the scene could find no "lividity" or pooling of the blood that occurs after death.

{¶14} When Mohler informed Aeschlimann that the child was gone, she testified, "he dropped to his knees and put his hands on his head." (1T. at 66).

{¶15} While photographing the child's body at the direction of the deputy sheriff, Mohler observed what she believed could be a small bruise on the child's rib cage. (1T. at 68)

**F. The Autopsy**

{¶16} Stark County Coroner P.S. Murthy, M.D. testifed that he conducted an autopsy upon the body of Bri'Sean Gamble on October 21, 2011. (2T. at 428).

{¶17} During his external examination of the body, Dr. Murthy noted a one-half inch contusion or bruise in the left chest area, a contusion under the chin of less than half an inch and extremely small contusions at each eyebrow. (2T. at 446-447). No evidence of injury was noted on the surface of the skin in the area of the back of the head, front of the head and the scalp. (2T. at 452).

{¶18} During his internal examination of the body, Dr. Murthy observed a tiny contusion in the left chest area extending to the lung. (2T. at 449-451). Dr. Murthy observed more than two "maybe ten, twelve, thirteen in that range, multiple, prominent, subgaleal contusions." (2T. at 452; State's Exhibits 8G; 8H; 8I; 8N and 8J). The subgaleal contusions were "on the top of the head, right side, left side and the back." (2T. at 459-460). Dr. Murthy further observed "the massive accumulation of acute subdural hemorrhage." (2T. at 464). Dr. Murthy concluded that the primary cause of death was blunt impacts to the head. (Id.)

{¶19} Dr. Murthy also found bronchopneumonia in the lungs. (2T. at 472). Dr. Murthy testifed concerning this finding,

> Well, to me, it indicates he sustained multiple, forceful blunt impacts
> injuries to the head. Again, to the best of my judgment and knowledge,

two or three forceful impacts on the head, the kid is unconscious, he's lying there and then the brain gets swollen, the brain is injured and the respiratory system gets labored, he gets snoring, shallow respirations and the celia does not move the secretions, so he's a beautiful candidate to develop bronchopneumonia. So injury on top of injury—a chain of events starts.

2T. at 473-474.

{¶20} Dr. Murthy testified that the child suffered multiple impacts, "maybe nine, ten, twelve, thirteen, I don't know. But two or three impacts itself would be sufficient to make a little child unconscious." (2T. at 475)

{¶21} Dr. Murthy concluded that Bri'Sean died as a result of multiple massive blunt impact injuries to his head and the back of his neck. (2T. at 477). Concerning the time of death, Dr. Murthy opined,

> Q.     Can you tell how long it would have taken this child to die after becoming unconscious and then, as you said, becoming a candidate for that bronchopneumonia?
>
> A.     To the best of my judgment and experience, the sequence would be something like this, three or four blunt impact injuries of this magnitude, the child would be unconscious, then the brain gets injured, starts getting swollen, and the accumulation of blood in the subdural space is a very strong thing you find in fatal head injuries. And then the subarachnoid hemorrhage. Subarachnoid hemorrhage is also an irritant and sometimes the medulla oblongata, where the heart and the brain

centers – brain functions, cardio-respiratory centers are located, when they're bathed in blood they get into spasm so the -- the chain of events take place and then he becomes a candidate for pneumonia so -- and then he will probably die of pneumonia three, four hours after injury, and then three or four hours later he dies, approximately.

2T. at 480.

### G. The Homicide Investigation

**{¶22}** Deputy Rick Stauffer of the Stark County Sherriff's Department responded to the 9-1-1 call at Aeschlimann's home on October 20, 2011. (1T. at 236). He attempted to obtain written statements from Aeschlimann and Brittany. Deputy Stauffer noted and photographed the small bruise on Bri'Sean's chest. (1T. at 246-247; State's Exhibit 4D).

**{¶23}** The following day, Deputy Stauffer was informed by an investigator from the coroner's office that Bri'Sean's death was ruled a homicide. Deputy Stauffer notified Detective John Von Spiegel. The pair met with the coroner's investigator and reviewed the physical findings.

**{¶24}** Detective Von Spiegel contacted Aeschlimann. He did not inform Aeschlimann about the results of the autopsy. Instead, Detective Von Spiegel told Aeschlimann he just had some follow-up questions. (2T. at 334). Detective Von Spiegel asked Aeschlimann to bring Brittany and Hannah to the station. Aeschlimann then took Hanna to his parents who were dining at a local restaurant. Aeschlimann subsequently informed Detective Von Spiegel that Hanna was not home, she was out to dinner with his parents. Detective Von Spiegel contacted Aeschlimann's parents, Jody and Alan,

who brought Hannah to the Sherriff's office around 8:30 p.m. Brittany's mother, Leslie Hoover, arrived around the same time.

**{¶25}** Detective Von Spiegel contacted C.J. Taylor of the Child Advocacy Center to conduct a "forensic interview" of Hannah at the police station. Ms. Taylor met Hannah in the lobby area when she arrived. Ms. Taylor described Hannah as "very bubbly, cheery, appeared to be above her developmental age." (1T. at 206). Hannah asked Ms. Taylor when it was going to be her time to talk. Brittany's mother told Ms. Taylor that she was shocked that Hanna had to be brought there at the time to go over things. (1T. at 308). Ms. Taylor conceded that it is "very rare" that such interviews are conducted outside their offices and never before in her 14 years and 1500 interviews had she been asked to do so in a police station because it is not the best environment. (1T. at 211-212). Aeschlimann and his parents both objected to the interview unless one of them was present. The interview did not take place at that time.

**{¶26}** Aeschlimann and Brittany were placed in separate interview rooms. Detective Von Spiegel testifed that Aeschlimann emptied his pockets of his keys, cell phone and wallet even though Detective Von Spiegel had not told him too. Aeschlimann testifed that one of the deputies told him to leave them. (3T. at 881-882). He further testified that he has never carried a wallet. Brittany's mother testifed that in response to his mother's question about why he was giving her his things, Aeschlimann responded, "Well, just in case something happens. I don't anticipate anything happening, but just in case." (1T. at 309). Aeschlimann testified that he said, "Can you hold on to these until I'm done." (3T. at 882). Aeschlimann further testified that Leslie Hoover was mistaken about what she had heard. (Id.)

{¶27} Detective Von Spiegel testifed that Aeschlimann admitted that he had spanked Bri'Sean on the butt on three occasions in the past. (2T. at 343-344). Aeschlimann testified that he told the Detective he had "patted" his butt. (3T. at 883-884).

{¶28} When Aeschlimann and Brittany were alone in their separate interview rooms, Brittany asked Aeschlimann "just tell me what happened. (1T. at 138; 2T. at 350). Aeschlimann responded that Brittany should tell them she does not want to talk anymore and that they will talk when they get home. (1T. at 138; 2T at 350).

{¶29} Aeschlimann told Detective Von Spiegel about Brittany's trip to Wal-Mart on October 19, 2011. When confronted, Brittany admitted the trip to Wal-Mart and produced a receipt. Surveillance photographs from Wal-Mart showed Brittany arriving at Wal-Mart at 10:35 p.m. and leaving the parking lot at 10:50 p.m. (1T. at 277-279).

{¶30} No admissions were obtained during the police interviews of Brittany or Aeschlimann. Aeschlimann was not permitted to have any contact with Hannah. Hannah left with her grandparents.

{¶31} With Aeschlimann's permission Chelsea Eberling, a forensic interviewer, interviewed Hannah two days later. (2T. at 599). The interview took place at the home of her grandparents. Aeschlimann was not present when the interview was conducted. The interview lasted four to five minutes because Hannah became distracted and did not want to talk. (2T. at 619). Hannah disclosed nothing traumatic during the interview.

{¶32} In March 2013, the Stark County Grand Jury returned an indictment that charged Aeschlimann with the charges of felony murder and child endangering for the death of two-year-old Bri'Sean T. Gamble on October 19, 2011.

{¶33} Deputy Stauffer and Detective Von Spiegel, the only two investigators assigned to this case, admit that during the interim of October 19, 2011 and Aeschlimann's arrest some 17 months later, they developed no witnesses to the inflicted injuries; nor witnesses to Bri'Sean's death; there were no admission or confessions to the alleged assault; no relevant physical evidence; nor did they even request forensic examinations other than the autopsy. In fact, other than the interviews of Brittany and Aeschlimann whom they declared to be the only two suspects, the only subsequent investigation include speaking to personnel at Wal-Mart; Brittany's ex-boyfriend Sean Gamble; and common associates of each. None were called as witnesses. After October 31, 2011, neither investigator did anything further related to this investigation, and "gathered no new evidence about this case." (2T. at 398). Both officers testified that during the 17 month idle time between October 31, 2011 and the indictment, Brittany's relatives were very active and public in attempts to see Aeschlimann charged including phone calls to Detective Von Spiegel, the prosecutor and others; letters to the editor; and a petition drive. (2T. at 388-389).

**H. The Defense Case.**

{¶34} The three pathologists who testified in this case all agreed that Bri'Sean suffered from, and died as a result of, subdural hematomas and his death was a homicide. Dr. P.S. Murthy (2T. at 464; 515) and Dr. Frank Miller (3T. at 965) for the state; and Dr. Jonathan Arden (2T. at 646) for the defense.

{¶35} Dr. Murthy would only say that the "injuries must have taken place after 8:30 p.m.," the last time Bri'Sean was observed to have appeared normal. (2T. at 542-543). Dr. Miller did not render an opinion regarding the time of injury explaining that the

observations of an "independent person" may have been helpful. However, he could not rely upon Brittany Boitnott, who was home with Bri'Sean, because he knew her to be a suspect (3T. at 972-973). Dr. Arden could only say that it is more likely that Bri'Sean was injured after 8:30 p.m. "but even that cannot be stated categorically." (2T. at 697).

**{¶36}** The defense introduced evidence of the principle of "lucid interval" after which an injury has been inflicted yet the subject does not appear to show symptoms of injury.

**{¶37}** Dr. Murthy agreed that he was aware of the principle and had read the studies on the subject by Dr. Jan Leestma in a publication entitled Forensic Neuropathology (2T. at 525). He also agreed, and stated, that a lucid interval is the proven principle that some people who suffer from a subdural hematoma do not show any "significant or neuro visible changes", i.e. symptoms. (2T. at 525-526). However, in the case at bar, Dr. Murthy unequivocally testified that the injuries to Bri'Sean were such that he would not have been able to function normally after the infliction.

**{¶38}** Dr. Miller opined that, he was familiar with the studies of Dr. Leestma and the principle of lucid interval and although he would not expect it, there is no way to "conclusively" determine whether Bri'Sean experienced a lucid interval. (3T. at 968-969; 971).

**{¶39}** Dr. Arden explained that the very nature of subdural hematomas, in that they bleed at different rates, makes it most difficult to determine the time of the injury (2T. at 650). He testified that he agrees with Dr. Leestma that subdural hematomas, especially in children, frequently have a lucid interval and the studies reflect conclusions derived from the studies of serious injuries to deaths in children (2T. at 656-657). In this

case, the mere fact that Bri'Sean may have appeared normal before 8:30 p.m. "does not exclude that he could have had that subdural hematoma already and he could have been in that lucid interval" and ˉbe could have been injured as much as an hour or two before 8:30." (2T. at 657; 684). However, Dr. Arden noted,

I think it's more likely that he's injured after 8:30, but he could have been injured any time between 8:30 and sometime in the early morning hours. Could have happened at any time in that - - the injury could have happened any time in that time frame, and actually death could have happened pretty much almost any time in that time frame as well given the variabilities [sic.] for accumulation of subdural hemorrhage and given the rigor mortis when found the next morning.

2T. at 685.

{¶40} The following exchange occurred during Dr. Arden's testimony,

Q.    Is it any more reasonable to say that these injuries were inflicted between 10:20 and 11:00 [while Brittany was at Wal-Mart] than to say that the injuries were inflicted between 8:30 and 10:00? [When Brittany was alone with both children]?

A.    No, it's not more reasonable at all. There's nothing medical that allows you to say it was more likely the 10:20 to midnight versus the 8:30 to 10:20. There's nothing you can do medically, that you can base an opinion on medically, that says it more likely happened in one time frame than the other.

Q.      And both Dr. Murthy and Dr. Miller have said it could have

occurred any time after 8:30?

A.      Yes, sir.

2T. at 269.

**I. Verdict and Sentence**

{¶41}  The jury first indicated that it had become deadlocked and was unable to

reach a verdict. After the trial court rendered a "Howard charge[1]," the jury returned with

a unanimous verdict of guilty of both counts charged in the indictment.

{¶42}  On September 4, 2013, Aeschlimann was sentenced on Count 1 to a term

of 15 years to life. The Court did not impose a sentence on Count 2 in light of the allied

offense provisions of R.C. 2941.25.

*Assignments of Error*

{¶43}  Aeschlimann raises five assignments of error,

{¶44}  "I. PROOF THAT APPELLANT AND THE MOTHER OF AN INFANT

CHILD WERE THE ONLY CAREGIVERS DURING A TIME PERIOD WHEN THE

CHILD SUFFERED TRAUMATIC INJURIES RESULTING IN HIS DEATH, WITHOUT

ANY EVIDENCE OF WHEN, HOW, OR BY WHOM THE INJURIES WERE INFLICTED,

IS INSUFFICIENT CIRCUMSTANTIAL EVIDENCE TO ESTABLISH GUILT BEYOND A

REASONABLE DOUBT.

{¶45}  "II. THE CORONER RENDERED TRIAL TESTIMONY UNDER OATH, ON

CRITICAL SUBJECTS, THAT WAS CONFLICTING AND IRRECONCILABLE, WHICH

---

[1] In *State v. Howard,* 42 Ohio St.3d 18, 537 N.E.2d 188(1989), the Ohio Supreme Court approved a supplemental charge to be given to juries that have become deadlocked on the question of conviction or acquittal.

PREJUDICED APPELLANT AND DENIED HIM DUE PROCESS UNDER THE CONSTITUTION OF THE UNITED STATES.

{¶46} "III. THE TRIAL COURT DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL BY PERMITTING EVIDENCE THAT HE HAD ENGAGED IN PROFESSIONAL MIXED MARTIAL ARTS FIGHTING."

{¶47} "IV. THE TRIAL COURT'S ORDER PROHIBITING APPELLANT'S COUNSEL, FROM READING, ARGUING OR REFERRING TO THE BILL OF PARTICULARS IN ARGUMENT DENIED APPELLANT HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL UNDER THE CONSTITUTION OF THE UNITED STATES.

{¶48} "V. THE TRIAL COURT DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL BY PROHIBITING THE DEFENSE FROM THE PRESENTMENT OF RELEVANT EVIDENCE REGARDING AN ALTERNATIVE SUSPECT."

I.

{¶49} Aeschlimann's first assignment of error challenges the sufficiency of the evidence. Subsumed within his argument, Aeschlimann contends his convictions are against the manifest weight of the evidence produced by the state at trial. [Appellant's Brief at 13].

{¶50} Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

**{¶51}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) at 1594.

**{¶52}** When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

> \* \* \*

> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶53}** There is no dispute in the case at bar that a Bri'Sean died because of blunt force trauma to his head and neck. Aeschlimann's main argument is that there was insufficient evidence to identify him as the assailant in the death of the child.

**{¶54}** The gravamen of Aeschlimann argument is that the time frame for Bri'Sean's injuries included two time periods when the two adults were separately alone with the child. Aeschlimann argues that the evidence did not prove beyond a reasonable doubt that he inflicted Bri'Sean's fatal injuries when he was alone with the boy, as opposed to Brittany inflicting the injuries when she was alone with her son.

{¶55} Aeschlimann relies upon *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (4th Dist.1996). In *Miley*, the state presented evidence that the defendant's infant daughter had been intentionally abused, and that the defendant and the child's mother were the only individuals with access to the child. However, there was no direct evidence that either the defendant or the mother had abused the child. Furthermore, the state could not establish a specific time period during which the child was abused.

{¶56} The trial court in *Miley* denied the defendant's Crim.R. 29 motion for acquittal. The jury found the defendant guilty of child endangering, in violation of R.C. 2919.22(A). The Fourth District Court of Appeals reversed, finding that the evidence was insufficient to support the conviction. The circumstantial evidence merely supported a fifty-percent possibility that either the defendant or the child's mother committed the abuse. Furthermore, the evidence did not establish that the defendant should have been aware that the child had been abused. Thus, the Court found that reasonable minds could only conclude that the state had not proven the material elements of child endangerment beyond a reasonable doubt. Id. at 745, 684 N.E.2d at 107.

{¶57} We find *Miley* to be distinguishable. In *Miley,* the other caregiver, the child's mother, did not testify during trial. In the case at bar, the only other person present during the period when the injuries occurred was the child's mother, Brittany. She testified that she did not inflict the fatal blows upon her son. Aeschlimann also testified in his own defense. Thus, the jury was able to hear and see the only persons who could have committed the crime.

**{¶58}** Indeed, the Fourth District Court of Appeals itself distinguished *Miley* on this basis in *State v. Sampsill*, 4th Dist. Pickaway No. 97CA17, 1998WL346680(June 29, 1998), wherein the court stated,

> The only other person present during the time-frame [when the child was injured] was Vanchure. He testified that he did not injure Brittany and the jury was free to believe his testimony. Further, appellant was alone with Brittany for a much larger portion of the time-frame than Vanchure.

*See also, State v. Swain,* 4th Dist. Ross No. 01CA2591, 2002-Ohio-414.("Although some evidence exists that appellant was not the sole caretaker during the period of time when the abuse occurred, once again the jury was free to reject appellant's other evidence...").

**{¶59}** If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E. 2d 492(1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668(1997).* "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 272,

574 N.E. 2d 492. While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293(1990), citing *Hurt v. Charles J. Rogers Transp. Co*, 164 Ohio St. 329, 331, 130 N.E.2d 820(1955). Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott,* 51 Ohio St.3d at 168, 555 N.E.2d 293, citing *Hurt,* 164 Ohio St. at 331, 130 N.E.2d 820.

{¶60} The jury heard evidence from the grandparents that the child was functioning normally as late as 8:30 p.m. The jury further was presented evidence that due to the severity of the blows inflicted upon him, Bri'Sean would most likely have been rendered unconscious. All three experts agreed that it was more likely that the injuries were inflicted after 8:30 p.m.

{¶61} The jury heard Brittany's explanation concerning the events that occurred after the grandparents had left. Brittany testified that she fed her son and gave him a bath around 9:15 p.m. She put him to bed around 10:00 to 10:15 p.m. Bri'Sean patted his pillow indicating that he wanted Brittany to lay with him. She did for a short time.

{¶62} The jury heard Aeschlimann's explanation as well. He testified that he did not interact with the child after he came home from work. The jury was aware that Aeschlimann was alone in the home with the children while Brittany went to Wal-Mart.

{¶63} Evidence was presented which if believed inferred that when asked by Detective Von Spiegel to bring Hanna with him, Aeschlimann instead deliberately took his daughter to his parents. The jury was presented with evidence that Aeschlimann refused to allow the authorities to interview Hannah that night in spite of the precautions that were taken to make her feel comfortable. The jury further heard evidence that when

asked by Brittany what had happened, Aeschlimann responded that she should stop talking to the police and he would discuss it when they got home.

**{¶64}** The jury heard the parties' evidence and counsels' arguments and was free to reject Aeschlimann's claims of innocence.

**{¶65}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Aeschlimann committed the crimes. We hold, therefore, that the state met its burden of production regarding each element of the crimes and, accordingly, there was sufficient evidence to support Aeschlimann's convictions.

**{¶66}** As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is

well established that the trial court is in the best position to determine the credibility of witnesses. See, e.g., *In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶ 9, citing *State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

{¶67} Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

{¶68} The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

{¶69} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or

sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, supra;

{¶70} We find that the jury neither lost his way nor created a miscarriage of justice in convicting Aeschlimann of the charges.

{¶71} Based upon the foregoing and the entire record in this matter, we find Aeschlimann's convictions were not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and the defendant's witnesses. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Aeschlimann's guilt.

{¶72} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of each crime beyond a reasonable doubt.

{¶73} Aeschlimann's first assignment of error is overruled.

II.

{¶74} In his second assignment of error, Aeschlimann argues that he was denied due process trial because the testimony of Dr. Murthy was conflicting in several respects. Aeschlimann first points to Dr. Murthy's testimony that he believed that a pillow or a towel had been used to cushion the blows delivered to Bri'Sean. Aeschlimann characterizes this testimony as false. Secondly, the coroner rendered testimony on cross-examination, on three separate occasions, that "any normal healthy adult, pretty much of any size, shape, or, you, know capability" could have inflicted the injuries that caused Bri'Sean's death. However, in response to the question of a juror, propounded by the Court, the coroner said the opposite. Aeschlimann cites *Ward-Collins v. Sugar,* 8th Dist. Cuyahoga No. 87546, 2006-Ohio-5589, 2006 WL 3030981 for the proposition that the Court of Appeals has a clear duty to grant a new trial on the weight of the evidence where it appears probable that a verdict is based upon false testimony.

{¶75} In *Tanzi v. New York Central RR. Co.*, 155 Ohio St. 149, 153, 98 N.E.2d 39, 42(1951), the Ohio Supreme Court stated the following rule for granting new trials where the movant claims that false testimony was given:

> A witness is required to take an oath before giving his testimony and is subject to prosecution for perjury if he gives false testimony. Furthermore, juries have the duty to detect and disregard false testimony. Finally, in the event that a jury does not detect and disregard false testimony, the trial court and the Court of Appeals [both have] a clear duty

to grant a new trial on the weight of the evidence where it appears probable that a verdict is based upon false testimony.

{¶76} In *Markan v. Sawchyn*, 36 Ohio App.3d 136, 138, 521 N.E.2d 824(8th Dist. 1987), the Court observed,

> In this case, defendant claims the record indicates that a key witness's testimony consisted of false statements. In reviewing the record, we conclude to the contrary. Although the testimony may at times have been inconsistent and contradictory, there is insufficient basis for a determination that it was false. If apparent contradictions by witnesses justified new trials, courts would be besieged with motions for new trials because such evidence is found in almost every trial.

*Accord, Silver v. Jewish Home of* Cincinnati, 190 Ohio App.3d 549, 2010-Ohio-5314, 943 N.E.2d 577(12th Dist.), ¶33. In this case, although the testimony may at times have been inconsistent and contradictory, there is insufficient basis for a determination that it was false. The statements were Dr. Murthy's opinions based upon hypothetical questions. They were subject to cross-examination and argument of counsel. Any inconsistency in Dr. Murthy's testimony goes to the weight, not the admissibility of the testimony. In other words, '[t]he jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest.' " *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77, 82, 228 N.E.2d 304(1967).

{¶77} Aeschlimann has failed to demonstrate that any of Dr. Murthy's testimony was false.

{¶78} Aeschlimann's second assignment of error is overruled.

III.

{¶79} In his third assignment of error, Aeschlimann contends that evidence admitted at trial that he had engaged in professional mixed martial arts fighting denied him due process and a fair trial because it was used as impermissible character evidence.

{¶80} In advance of trial, Aeschlimann's counsel filed a Motion in Limine notifying the Court of its objection to the admission of other acts and character evidence. Specifically, evidence that Aeschlimann was a professional mixed martial arts fighter. (See, T. August 2, 2013 at 14-25). The state responded:

> As the material issue in the case is not the cause of death, but rather the identity of the perpetrator, evidence of the defendant's extensive training, knowledge and experience in fighting is extremely probative and material.

{¶81} At trial, the state asked Brittany Boitnott where she had met defendant, she responded, "When I did ring card girl for Fight Fest," and defendant objected. (1T at 91). The court allowed the testimony but reserved ruling on the publication of a photograph of defendant in his fighting apparel. The prosecution then asked if he was "involved as a fighter." Again, defense objections were overruled (1T. at 94). Boitnott then testified that he was involved in that kind of fighting throughout the time she knew him and he was definitely less muscular now. She then identified his photograph but it was not displayed to the jury.

{¶82} During cross-examination of Aeschlimann, the prosecutor returned to the subject of Aeschlimann's professional fighting by asking whether he was healthy enough to "train and workout in MMA fighting," and later, whether he had to be physically fit "in order to be a cage fighter." (3T. at 886).

{¶83} During closing argument the character references continued as the prosecutor said, "This defendants a fighter, he's aware of his power, his strength." (4T. at 1013). The argument continued as the prosecutor compared Aeschlimann to Brittany Boitnott by asserting, "It's not her who's used to using his strength in the way that he does in the ring or the cage." (4T. at 1019).

{¶84} Evid.R. 404(B) is in accord with R.C. 2945.59 in that it precludes the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes. *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, syllabus. The Court in *Williams* noted,

> The General Assembly, however, has codified certain exceptions to the common law regarding the admission of evidence of other acts of wrongdoing. Those exceptions are contained in R.C. 2945.59:
>
> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous

with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

This court likewise has promulgated Evid.R. 404(B), which states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶15.

{¶85} The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. See *State v. Curry* (1975), 43 Ohio St.2d 66, 68, 330 N.E.2d 720(1975). This danger is particularly high when the other acts are very similar to the charged offense, or of an inflammatory nature, as is certainly true in this case. *State v. Schaim,* 65 Ohio St.3d 51, 60, 1992-Ohio-31, 600 N.E.2d 661,669.

{¶86} Other acts may prove identity by establishing a *modus operandi* applicable to the crime with which a defendant is charged. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180(1990), syllabus. "'Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was

used in the commission of the charged offense." *State v. Smith*, 49 Ohio St.3d 137, 141, 551 N.E.2d 190(1990); *State v. Lowe, supra*, 69 Ohio St.3d at 531, 1994-Ohio-345, 634 N.E.2d at 629.

{¶87} "Pattern" evidence refers to other acts evidence that is admissible when the defendant's scheme, plan, or system in doing an act is relevant at trial. Evidence of a defendant's scheme, plan, or system in doing an act can be relevant for two reasons: (1) the other acts are part of one criminal transaction such that they are inextricably related to the charged crime, and (2) a common scheme or plan tends to prove the identity of the perpetrator. *State v. Curry* (1975), 43 Ohio St.2d 66, 72-73, 330 N.E.2d 720(1975).

{¶88} In the case at bar, without any evidence directly implicating Aeschlimann's mixed martial arts background in the death of Bri'Sean we fail to see how evidence of Aeschlimann's mixed martial arts training or background was a matter genuinely in issue. Put differently, we fail to see how such evidence was circumstantially connected to the manner or cause of Bri'Sean's death. The record in this case presents no basis to conclude that Aeschlimann's fighting background was in any sense intrinsic to the death of the child. As we have noted, there is no evidence connecting the amount or type of force necessary to inflict the injuries to any expertise or training in the mixed martial arts. Rather, the experts agreed that any adult could have inflicted the fatal blows. The only purpose of such testimony and argument appears to have been to portray Aeschlimann as a person with violent propensities. *State v. Johnson*, 71 Ohio St.3d 332, 340, 1994-Ohio-304, 643 N.E.2d 1098. *Accord, State v. Burson*, 38 Ohio St.2d

157, 159-160, 311 N.E.2d 526(1974); State *v. Griffin,* 142 Ohio App.3d 65, 75-76, 753 N.E.2d 967(1st Dist. 2001).

**{¶89}** In S*tate v. Hirsch,* 129 Ohio App.3d 294, 309, 717 N.E.2d 789(1st Dist. 1998), the Court observed,

> More troublesome is Hirsch's contention that the trial court admitted evidence that Hirsch had a violent military background, that he collected and carried weapons, that he had behaved violently, that he lived in a desolate "compound," and that he had the nicknames "Rambo" and "Psycho Johnny." Much of this evidence was other-acts evidence presented solely for the purpose of painting Hirsch as a violent individual, and it was clearly inadmissible under Evid.R. 404(B). *See State v. Gillard* (1988), 40 Ohio St.3d 226, 230, 533 N.E.2d 272, 277, *certiorari denied* (1989), 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608; *State v. Davis* (1989), 64 Ohio App.3d 334, 339–340, 581 N.E.2d 604, 607–608; *State v. Jones* (Dec. 29, 1995), Hamilton App. No. C–950005, unreported, 1995 WL 763604. Some of it was not technically other-acts evidence, but it had little relevance other than to portray Hirsch as a violent individual. *See Soke, supra*, 105 Ohio App.3d at 249, 663 N.E.2d at 1001; *Jones, supra.* Consequently, the trial court erred in admitting this evidence.

**{¶90}** Despite finding that the trial court erroneously admitted the other-acts evidence in the case at bar, we must determine if the error was harmless. Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also State v. McKnight*, 107 Ohio St.3d

101, 2005–Ohio–6046, 837 N.E.2d 315, ¶88 (applying non-constitutional harmless-error analysis to erroneous admission of other acts evidence). To find an error harmless, an appellate court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State v. Lytle*, 48 Ohio St.2d 391, 403, 358 N.E.2d 623 (1976).

**{¶91}** In determining   whether an error in the admission of evidence is "harmless",  we  agree with the Supreme Court of Montana that at least three different approaches appear in United States Supreme Court cases: (1) Focusing on the erroneously admitted evidence or other constitutional error to determine whether it might have contributed to the conviction *e. g., Fahy v. Connecticut*  375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171(1963); (2) excluding the constitutional infirmity where overwhelming evidence supports the conviction *e. g., Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1(1972); (3) determining whether the tainted evidence is merely cumulative or duplicates properly admitted evidence *e. g., Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284(1969). *See, State v. McKenzie*, 186 Mont. 481, 533, 186 P.2d 428(1980). These three differing approaches have been noted in Ohio. *See, State v. Rahman,* 23 Ohio St.2d 146, 151, 492 N.E.2d 401(1986)("Upon a thorough review of the record, we simply cannot state in good conscience that the error in the admission of this privileged testimony was either harmless beyond a reasonable doubt, did not have an impact on the jury, or did not contribute to appellant's conviction in any meaningful degree." (Footnote omitted)).

**{¶92}** In *Fahy v. Connecticut*, the United States Supreme Court held that the erroneous admission of unconstitutionally obtained evidence required reversal, noting that the Supreme Court was "not concerned ... with whether there was sufficient

evidence on which the [defendant] could have been convicted" absent the erroneously admitted evidence, but rather whether there was a "reasonable possibility that the evidence complained of might have contributed to the conviction." 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

{¶93} In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court rejected the view that all federal constitutional errors in the course of a criminal trial require reversal. The Court held that the Fifth Amendment violation of prosecutorial comment upon the defendant's failure to testify would not require reversal of the conviction if the State could show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id., at 24, 87 S.Ct. at 828.

{¶94} In *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Court further explained the harmless error analysis as set forth in *Chapman,*

> Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. *See Chapman*, *supra*, 386 U.S., at 24, 87 S.Ct. at 828 (analyzing effect of error on "verdict obtained"). Harmless-error review looks, we have said, to the basis on which "the jury *actually rested* its verdict." *Yates v. Evatt*, 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to

the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan* at 279, 113 S.Ct. 2078, 124 L.Ed.2d 182.

{¶95} As one Court has explained,

Thus we, as a reviewing court, do not pretend that the constitutional error did not occur and then evaluate how overwhelming the evidence would have been to a hypothetical jury, or even to the jury charged with fairly deciding this case. We do not hypothetically extract the error from the trial which the jury heard; we must, however, consider and weigh the *effect* of the error on the actual jury.

After evaluating the effect of the error in this case, if we find "[u]nder these circumstances" that it is completely impossible for us to say the prosecution has demonstrated, beyond a reasonable doubt, that the trial prosecutor's questioning and comments, and the trial judge's error, did not contribute to Mr. Marshall's conviction, then we cannot find the error harmless. *See Chapman v. California*, *supra* at 26, 87 S.Ct. 824. And if the error is not harmless, then Mr. Marshall is entitled "to a trial free from the pressure of unconstitutional inferences." Id. But if we can find beyond a reasonable doubt that this jury's verdict is surely unattributable to the constitutional error, then the error is harmless and the trial was fair. (Citations omitted).

*State v. Marshall,* 2012-0650, 120 So.3d 922, 929(La.App. 4 Cir. 7/31/13). In *State v. Rahman,* the Ohio Supreme Court recognized this principal,

> We are also mindful that our role upon review of this case is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury. In writing about the court's function on federal appellate review, Justice John Paul Stevens' observation is particularly appropriate:
>
> "'[I]t is not the appellate court's function to determine guilt or innocence * * *. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out * * *. [T]he question is, not were [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.' " *United States v. Hasting* (1983), 461 U.S. 499, 516, 103 S.Ct. 1974, 1984, 76 L.Ed.2d 96, Stevens, J. concurring (*quoting Kotteakos v. United States* [1946], 328 U.S. 750, 763-764, 66 S.Ct. 1239, 1247-1248, 90 L.Ed. 1557).

*State v. Rahman,* 23 Ohio St.3d 146, n. 4, 492 N.E.2d 401. This standard of review has been applied by the Ohio Supreme Court,

> Thus, under Section 2945.83 of the Revised Code it would seem that since there is substantial evidence to support the guilty verdict even after the tainted evidence is cast aside, we should affirm. However, under

*Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), and *Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (decided February 20, 1967), we are refused that course of action. In *Fahy*, the court said that when constitutionally inadmissible evidence has been admitted, a reversal is required where 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' (Emphasis added.) *In Chapman,* the court made it clear that the *Fahy* rule applied to federal constitutional errors in spite of a state harmless-error statute to the contrary.

*State v. Cowans*, 10 Ohio St.2d 97,104-105, 227 N.E.2d 201(1967).

{¶96} In the case at bar, we find beyond a reasonable doubt, that the evidence of Aeschlimann's mixed martial arts background did not contribute to his conviction. Both Aeschlimann and Brittany testified at trial. The jury was able to personally observe the physical characteristics, size, relative strength and demeanor of each. Each expert testified, in essence, that no special strength or skill was need to inflict the fatal blows. Aeschlimann testifed that he uses strength and technique to restrain individuals in his job as a corrections officer at a maximum-security facility for juvenile offenders[2]. Thus, evidence of his mixed martial arts training is cumulative to other evidence that was admitted concerning his strength and abilities.

{¶97} Based upon the entire record before us, we conclude that any error in the admission of the mixed martial arts testimony was harmless beyond a reasonable doubt.

_____

[2] Although Aeschlimann initially objected to this testimony at trial, he does not assign as error the introduction of this testimony in this appeal. (3T. at 888).

{¶98}  Aeschlimann's third assignment of error is overruled.

IV.

{¶99}  In his fourth assignment of error, Aeschlimann maintains the trial court's order prohibiting appellant's counsel from reading, arguing or referring to the bill of particulars in argument denied appellant his constitutional rights to a fair trial.

{¶100} The content of a Bill of Particulars filed in this case and served upon the defense on March 12, 2013 recited,

On or about October 19, 2011 between 10:20 p.m. and midnight... defendant did recklessly abuse and cause serious physical harm to Bri'Sean Gamble... by inflicting massive blunt force injuries to his head and posterior neck, which proximately resulted in the child's death. . .

{¶101} The trial court sustained the state's motion to amend the bill of particulars to extend the timeframe during which the injuries were alleged to have been inflicted to include "the early morning hours of October the 20." (3T. 728; 935-941).

{¶102} Aeschlimann contends that the prosecution's claims regarding the time of injury as first articulated in the Bill of Particulars and then as amended were relevant to the understanding of the jury regarding the state's expressed uncertainty. Aeschlimann then argues,

The jury had heard references to the Bill of Particulars during the defense examination of Dr. Arden (R.674, 678). The Court conceded the jury had asked questions regarding what a Bill of Particulars is (R.940) and acknowledged that she didn't "think the jury knows what a Bill of Particulars is." *Yet the Court denied instruction thereon in violation of the*

*Court's duty to provide relevant instruction that are necessary for the jury to weigh the evidence and to discharge its duty as the fact finder. State v. Steele,* 2011WL5119107 (Ohio App. 1st Dist.), citing *State v. Cornon* (1990), 50 Ohio St.3d 206, paragraph two of the syllabus. (Emphasis added).

Appellant's Brief at 23.

{¶103} This appears to be a different claim than the claim set forth in the fourth assignment of error. Accordingly, we interpret Aeschlimann's fourth assignment of error in the following manner:  The trial court erred in failing to provide the jury adequate instructions concerning the purpose of a bill of particulars and the fact that the bill of particulars in the case at bar had been amended. (3T. at 731).

{¶104} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3rd Dist.1993). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140(1983). Jury instructions must be reviewed as a whole. *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792(1988).

{¶105} Crim.R. 30(A) governs instructions and states as follows:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The

court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court need not reduce its instructions to writing.

On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

{¶106} Aeschlimann did not file a written request for specific jury instructions, and did not object to the trial court's jury instructions. The trial court specifically asked trial counsel "Does counsel desire anything further at this time?" (4T. at 1109). Both counsel answered in the negative. (Id.).

{¶107} Based upon Aeschlimann's failure to proffer instructions or object to the instructions and bring the issue to the trial court's attention for consideration, we must address this assignment under the plain error doctrine pursuant to the Crim.R. 52(B).

{¶108} As the United States Supreme Court observed in *Puckett v. United States*, 526 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266, (2009),

If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; "anyone familiar with the work of courts understands that errors are a constant in

the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal."

556 U.S. at 134. (Citation omitted).

[A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*United States v. Marcus,* 560 U.S. 258, 130 S.Ct. 2159, 2164,176 L.Ed.2d 1012 (Internal quotation marks and citations omitted). The Ohio Supreme Court pertinently addressed when structural error analysis should be used in *State v. Perry,*

We emphasize that both this court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. See *Hill*, 92 Ohio St.3d at 199, 749 N.E.2d 274; *Johnson*, 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed.2d 718. This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to encourage defendants to remain silent at trial only later to raise the error on appeal where the conviction

would be automatically reversed. We believe that our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court-where, in many cases, such errors can be easily corrected.

101 Ohio St.3d 118, 802 N.E.2d 643, 2004-Ohio-297, ¶23. Thus, the defendant bears the burden of demonstrating that a plain error affected his substantial rights and, in addition that the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508(1993); *State v. Perry,* 101 Ohio St.3d at 120, 802 N.E.2d 643. Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240(2002); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph three of the syllabus*; Perry,* supra, at 118, 802 N.E.2d at 646.

{¶109} In the case at bar, the jury was instructed, in pertinent part,

The offenses charged are alleged to have taken place on or about the 19th day of October 2011. It is not necessary that the State prove that the offenses were committed on the exact day as charged in the indictment. It is sufficient to prove that the offenses took place on a date reasonably near the date claimed.

4T. at 1000. This is a correct statement of law. *See, State v. Sellards*, 17 Ohio St.3d 169, 478 N.E.2d 781(1985); *State v. Adams*, 5th Dist. Licking No. 02-CA-00043, 2002-Ohio-5953, ¶8.

{¶110} The trial court further instructed the jury in relevant part,

Before you can find the Defendant Guility of this charge [murder], you must find beyond a reasonable doubt that on or about the 19th day of October, 2011, and in Stark County Ohio, the Defendant recklessly cause the death of Bri'Sean T. Gamble...

4T. at 1001. Ordinarily, precise times and dates are not essential elements of offenses. Thus, the failure to provide dates and times in an indictment will not alone provide a basis for dismissal of the charges. A certain degree of exactitude of averments, where they relate to matters other than elements of the offense, is not *per se* impermissible or necessarily fatal to a prosecution. *State v. Sellards*, 17 Ohio St.3d 169, 171(1985).

{¶111} We note that the purpose of a bill of particulars is "to elucidate or particularize the conduct of the accused alleged to constitute the charged offense." *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E. 2d 781, 784(1985). It also acts to "inform an accused of the exact nature of the charges against him so that he can prepare his defense thereto." *State v. Fowler*, 174 Ohio St. 362, 364, 189 N.E.2d 133, 134(1963). Consistent with this purpose, Crim.R. 7(D) allows amendment of a bill of particulars "before, during, or after a trial," provided that "no change is made in the name or identity of the crime charged." See, also, *State v. Brown*, 99 Ohio App.3d 604, 610, 651 N.E.2d 470, 474(1994). Aeschlimann does not argue that the trial court erred by permitting the state to amend the bill of particulars.

{¶112} Accordingly, we find no error as the trial court properly instructed the jury in accordance with the law. Further, we find Aeschlimann did in fact argue to the jury the uncertainty concerning the time the injuries were inflicted. (4T. 1067-1071; 1075-1076).

Thus, any error in the trial court's exclusion of evidence or argument concerning the Bill of Particulars was harmless beyond a reasonable doubt.

{¶113} Aeschlimann's fourth assignment of error is overruled.

V.

{¶114} Aeschlimann's fifth assignment of error challenges the trial court's ruling that allegedly prevented him from introducing evidence of an alternative suspect for Bri'Sean's death. We note that this assignment of error appears overbroad. The only other potential suspect was the child's mother Brittany Boitnott. Aeschlimann does not contend that he was prohibited from introducing evidence of a third party. Rather, Aeschlimann wanted to introduce evidence that Brittany had been convicted of driving while under the influence, and was going to Wal-Mart in order to obtain personal items for her upcoming three-day attendance at the Driver Intervention Program. Aeschlimann also wanted to present evidence that Brittany was therefore driving while under suspension when she went to Wal-Mart. The trial court precluded this evidence.

{¶115} "It is axiomatic that a determination as to the admissibility of evidence is a matter within the sound discretion of the trial court. See *Calderon v. Sharkey*, 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008(1982). The issue of whether testimony is relevant or irrelevant, confusing or misleading is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury." *State v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382(1988).

{¶116} The relevant fact that Brittany was going somewhere that she did not relish going was introduced at trial. The addition of the fact that she was to attend a driver intervention program is irrelevant because it does not have the tendency to make

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 101. In addition, Evid.R. 609(A) does not provide for using a witness's prior misdemeanor OVI conviction (punishable by imprisonment for a period of less than one year) for impeachment purposes. To permit evidenced of the witness's attendance at a driver's intervention program would circumvent Evid.R. 609 in the case at bar.

{¶117} The trial court did permit evidence about whether Brittany was upset. (1T. at 153; 188-189). Aeschlimann further was permitted to introduce evidence that Brittany discussed being upset with Aeschlimann's mother. (3T. at 752). Therefore, any error in the trial court's exclusion of the specific evidence Aeschlimann sought to admit was harmless beyond a reasonable doubt.

{¶118} We find that the trial court did not abuse its discretion by excluding reference to the driver intervention program.

{¶119} Aeschlimann next argues that he should have been permitted to introduce evidence that Brittany had driven to Wal-Mart in violation of her driver license suspension. This information was irrelevant because it does not have the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 101. In addition, the introduction of this evidence may have been a two-edged sword. The fact that her license was under suspension may have benefitted the state. The state could have argued that Brittany did not volunteer that she had gone to Wal-Mart when questioned by the police because she was afraid she would be charged with driving under suspension.

{¶120} We accordingly find that the trial court did not abuse its discretion by excluding reference to the driver license suspension.

{¶121} Aeschlimann's fifth assignment of error is overruled.

{¶122} For the forgoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is affirmed.

By Gwin, P.J., and

Farmer, J., concur

Delaney, J., dissents

*Delaney, J., dissenting.*

{¶123} I respectfully dissent from the majority's conclusion in ¶ 97 that the admission of the mixed martial arts ("MMA") testimony was harmless beyond a reasonable doubt.

{¶124} In the instant matter, the state argued the fatal head injuries suffered by Bri'Sean were more likely caused by Aeschilmann because he was a larger, more physically fit person than Brittany, he engaged in MMA fighting and worked as a corrections officer.

{¶125} MMA is a full contact combat sport that uses striking and grappling techniques in a ring or fenced area, commonly called a "cage". At the pre-trial stage the state argued "the Defendant's knowledge and expertise and training and fighting with his hands is clearly relevant, probative evidence in this case because it makes the fact more likely that he is the perpetrator of the offense. It shows his familiarity with placement of blows in the back of the head or in areas - - specific areas of the body. It is plain and simple Your Honor, highly probative evidence that is circumstantial evidence that the jury can use in this case and should have the ability to use." (Hearing Transcript, p. 19-20).

{¶126} At trial, however, the experts agreed that any adult could have inflicted the fatal blows, as noted by the majority. The state never developed in the record how Aeschilmann's training in this sport was relevant to Bri'Sean's injuries. In closing argument, the state portrayed Aeschilmann as the "fighter" and corrections officer who was aware of his power and strength "in the ring or the cage" and in his job working with "violent youth".

{¶127} I disagree with the majority's conclusion the evidence of Aeschilmann's mixed martial arts involvement was cumulative and harmless. The trial record reflects the state specifically relied upon this evidence in attempting to convince the jury Aeschilmann was capable of inflicting the deadly trauma.

{¶128} Recently, courts have addressed evidentiary issues involving a defendant's knowledge and training in MMA. In *State v. Boscarino*, 2nd Dist. Montgomery No. 25580, 2014-Ohio-1858, the court found the defendant's status as a licensed MMA fighter was relevant to his awareness that his punches could inflict serious physical harm. The court cited to cases from other jurisdictions finding MMA or boxing training can be probative of the defendant's awareness his actions or culpable mental state in causing injury. I would agree with this holding in cases when it is undisputed the defendant inflicted injury but the defendant's state of mind remains disputed.

{¶129} However, the state agrees on appeal this case was about time, not manner, of death. Under the circumstances herein, I would conclude that the evidence was not offered for a legitimate purpose, and had limited probative value which is outweighed by the danger of unfair prejudice. There were only two possible perpetrators, Aeschilmann and Brittany. Thus, the credibility of the witnesses was key to the case. Aeschilmann's participation and training in MMA tempts the jury to find he is not credible based on his participation in a violent sport, rather than the actual facts and circumstances of the case.

{¶130} For these reasons, I would sustain the third assignment of error, reverse the judgment of the trial court and remand the matter for a new trial.